**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| KNOWLEDGE ECOLOGY INTERNATIONAL, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 1:20-cv-02986-KBJ |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICE; U.S. DEPARTMENT OF THE ARMY, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**JOINT STATUS REPORT**

Pursuant to the Court's January 19, 2020 Minute Order, the Parties, by and through their undersigned counsel, respectfully submit the following.

On October 16, 2020, Plaintiff Knowledge Ecology International ("KEI") filed this Freedom of Information Act ("FOIA") lawsuit against the United States Department of Health and Human Services ("HHS") and the United States Department of the Army ("Army"). At issue in this FOIA lawsuit are fourteen FOIA requests filed by KEI with HHS and Army seeking contracts between the federal government and private medical companies for research and development into treatments and vaccinations for COVID-19. KEI filed a second amended complaint on January 19, 2021. (Dkt. No. 14). Defendants filed an answer to the second amended complaint on January 22, 2021. (Dkt. No. 15).

The Parties' first joint status report was filed with the Court on January 11, 2021. (Dkt. No. 13). On January 19, 2021, the Court ordered the Parties to file a further joint status report that proposes a schedule for the production of responsive records, and that if the Parties are unable to agree on a production schedule, then each Party's proposal. The Court further ordered Defendants

to answer additional questions. The Court also ordered the parties to "propose a schedule for briefing redaction-related issues, on the assumption that the Court will seek to address that dispute concurrently with the proposed schedule for production."

The undersigned counsel have conferred but were unable to agree on a timeframe for completion of processing and production of the outstanding materials. The Parties also do not agree on a proposed briefing schedule for redaction-related issues. The Parties agree that the next Joint Status Report should be filed on March 8, 2021.

## PLAINTIFF'S STATEMENT

A. PLAINTIFF'S PROPOSED PRODUCTION SCHEDULE[1]

1. KEI proposes that the Court require Defendants to produce 3,000 to 5,000 pages per month if production does not occur concurrently with briefing redactions to the already-produced contracts, and 1,000 pages per month if briefing occurs concurrently.

   KEI proposes that the Court enter a scheduling order requiring that HHS produce 5,000 pages per month and that the Army produce 3,000 pages per month until production is complete, starting on the date on which the Court enters the scheduling order. As explained below, if the Court adopts this production rate, Defendants may complete production in approximately two to

---

[1] KEI respectfully requests that the Court allow the parties to submit additional briefing and supplemental evidence for the parties' respective positions, for another five business days. KEI anticipated filing a short, less than 10-page status report with a brief explanation of the parties' requests and positions. When, however, KEI received Defendants' draft submission this morning and two declarations in the morning and afternoon, KEI realized that Defendants would be filing something more akin to a brief or motion. KEI requested Defendants' consent to file a motion for an extension of time to brief these issues in a motion format, with a standard 10-day opposition, but Defendants would not consent. Accordingly, KEI had less than one day to respond to a status report and two declarations that more closely resemble a motion than a typical status report. KEI believes that additional time to respond to Defendants' declarations and legal arguments would be helpful, but nonetheless made its best efforts to respond to Defendants within the Court's deadline. KEI also requests a hearing.

three months. Conversely, if the Court accepts Defendants' proposal, production will take *at least* another eight months for the Army and thirteen months for HHS.[2]

KEI can provide only minimum estimates of the necessary processing times because Defendants have not yet ascertained the total number of responsive records within their agency. KEI devised its estimates by conducting a preliminary search and review of contracts that satisfy the criteria of the scope of the FOIA requests at issue and locating their contract numbers, dates, and total awards in U.S. dollars, using publicly-available information. KEI provided the lists to Defendants' counsel with the disclaimer that the lists were not exhaustive and that KEI is not required to provide such a list because the requests reasonably describe the records sought. KEI merely provided the lists in an effort to facilitate timely production of the contracts.

Importantly, and as explained below, even the minimum estimates provided by KEI show that Defendants' proposed production schedule is not supported by law and would frustrate the intent of the FOIA. If KEI were to have to wait more than thirteen months to receive all HHS and Army contracts, it would lose opportunities to use this information to influence the public debate about the COVID-19 response and legal options for addressing shortages, before more decisions on the ground are made. KEI seeks this information to inform the public about an issue of widespread interest while there is still time to influence the response. Each day that passes that window of opportunity narrows and the informational value of the contracts declines. Moreover,

---

[2] To devise these estimates, for each agency, KEI made a preliminary list of all responsive contracts it could locate using publicly-available information. KEI then noted the page count for each of the contracts already produced, and multiplied that number by the total number of contracts so far produced to arrive at a total number of pages produced. KEI then divided the total number of pages produced by the number of contracts produced to arrive at an average page count. Next, KEI multiplied the average page count by the minimum number of contracts outstanding for each agency, to arrive at a minimum  number of pages outstanding. Finally, KEI divided the minimum estimate of total pages outstanding per agency by their proposed production rate of 400 pages per month. KEI did not count contracts for which only amendments were produced, because the page numbers in the amendments were not a representative example of the length of the contract. KEI emphasizes that the number of outstanding pages and time of remaining production are likely substantially greater than KEI's minimum estimates.

the longer the pandemic persists, the greater the harm in terms of our health, economic, and social welfare.

If the Court is inclined to enter a briefing schedule to litigate redactions of the already-produced contracts concurrent with production of outstanding records, KEI appreciates that some of Defendants' FOIA resources may need to be temporarily diverted to the creation of *Vaughn* indices, which Defendants say will take 45 days to do. In that case, a higher rate of production may be less critical. If KEI can be heard now on the redactions, then a rate of 1,000 pages per agency per month would be acceptable because then KEI would not have to wait more than 13 months to be heard on the redactions to the contracts ready to be litigated. Under a 1,000 pages per month processing rate, it would take at least five months for HHS to conclude its production and three months for the Army. While this timeline would still dilute the value of the information, it would be a vast improvement upon Defendants' proposal of 400 pages a month.

KEI requests that if the Court is not persuaded why the 5,000/3,000/1,000 pages per month rates are appropriate, it nonetheless does not accept Defendants' proposals, which are not reasonable and would clearly frustrate the intent of the FOIA.

2. The Court should require each Defendant to produce 5,000 pages per month where the subject of the requests is a matter of widespread public interest; KEI has been granted expedited processing of some of the requests at issue and all requests are materially identical; KEI has a considerable record of disseminating information to the public, including in connection with the requests at issue; and the production will benefit other requesters.

A court "may use its equitable powers to require the agency to process documents according to a court-imposed timeline." *Seavey v. Dep't of Justice*, 266 F. Supp. 3d 241, 245 (D.D.C. 2017)(quoting *Clemente v. FBI*, 71 F.Supp.3d 262, 269 (D.D.C. 2014)). Courts have imposed processing rates far exceeding 500 pages per month when, as here, the records sought

would shed light on matters of widespread public interest, the requester has a strong knowledge of the subject matter and record of disseminating information to the public, and the records were time-sensitive or the request was entitled to expedited processing. All of these factors are present here, to a high degree.

In *Clemente v. Federal Bureau of Investigation*, the Court required the FBI to process 5,000 pages per month, on the grounds that the records requested pertained to an issue of public attention, the requester had "considerable capacity to disseminate information to the public[,]" and the records were time-sensitive in light of the fact that the requester was terminally ill. *See Clemente v. Fed. Bureau of Investigation*, 71 F. Supp. 3d at 268-69. Similarly, in *Seavy v. Department of Justice*, the Court required the FBI to produce 2,850 pages per month, basing its decision in part on the public interest in the records sought, calling the requester's research "a project of substantial substance in terms of shedding light [on government activity]". *Seavey v. Dep't of Justic*e, 266 F. Supp. 3d at 248. And while the Court did not impose a faster processing rate in *Middle East Forum v. United States Department of Homeland Security*, it observed that a faster rate than 500 pages per month would have been justified if the requester had shown that it was entitled to expedited processing, or if it produced more than generalized statements that the material sought was time-sensitive and important to the public. *Middle E. Forum v. U.S. Dep't of Homeland Sec*., 297 F. Supp. 3d 183, 187 (D.D.C. 2018). More recently, the Court granted the plaintiff's motion for a preliminary injunction regarding the plaintiff's requested processing rate on the basis that the plaintiff sought to inform the public about ICE's response to the pandemic and planned to widely disseminate the information to contribute to the public debate on the issue. *Am. Immigration Council v. U.S. Dep't of Homeland Sec*., 470 F. Supp. 3d 32, 39 (D.D.C. 2020).

In contrast, when this Court has upheld a minimum processing rate of 500 pages per month, the requester had not shown that it was entitled to expedited processing, or the request was self-serving and not of widespread public interest. For example, in *Negley v. the United States Department of Justice*, the Court approved a 500 page per month processing rate when the requester did not establish that he was entitled to expedited processing and pursued the records merely to satisfy his own curiosity. *See Negley v. U.S. Dep't of Justice*, 305 F. Supp. 3d 36, 46 (D.D.C. 2018), *aff'd sub nom. Negley v. United States Dep't of Justice*, No. 18-5133, 2018 WL 4148608 (D.C. Cir. Aug. 14, 2018). In *Chaverra v. Immigrations and Customs Enforcement*, a case cited by Defendants, the Court denied the plaintiff's request for a processing rate of more than 500 pages per month when the plaintiff was not granted expedited processing on his request and it pertained to the decedent's estate that he was administering. *Chaverra v. U.S. Immigration & Customs Enf't*, No. CV 18-289 (JEB), 2020 WL 7419670, (D.D.C. Nov. 5, 2020). And as noted, in *Middle East Forum*, the Court based its decision not to impose a faster processing rate on the fact that the plaintiff had not shown that it was entitled to expedited processing or that the information it was seeking was of widespread or time-sensitive interest to the public. 297 F. Supp. 3d at 186.

As explained below, this case presents the same facts that lead this Court to enter an accelerated processing schedule and is not analogous to the cases in which the Court upheld a minimum rate of 500 pages per month.

   a.  The records sought contain information of a time-sensitive nature of widespread interest to the public because the contracts inform the legal options that the United States government may exercise to address shortages of critical COVID-19 supplies.

The fourteen FOIA requests at issue all seek contracts executed by the United States government for the development or purchase of COVID-19 vaccines, treatments, diagnostics,

and other materials needed to save lives, limit the spread of the coronavirus, bring about a speedier end to the pandemic, and reduce human suffering, in a once in a century pandemic. As long as the pandemic persists anywhere in the world, lives will continue to perish, suffering will persist, and the competition for scarce resources has the potential to foment conflict and undermine national security. Yet while effective vaccines and other technologies have been granted authorization by the United States Food and Drug Administration, many who could benefit from the vaccines or treatments are unable to access them, due to shortages caused by the companies' monopolies on their patents, data, and know-how.[3]

The contracts, to a large extent, inform what the U.S. government can and cannot do to overcome barriers to access of taxpayer-funded COVID-19 technologies and scale up manufacturing. The transparency of these agreements is made even more critical by the fact that many if not most of the contracts are Other Transaction Agreements (OTAs), a type of agreement believed by federal agencies to be exempt from the laws and regulations that apply to standard contracts.[4] Accordingly, the only way to know what rights the contracts reserve for the U.S. government in intellectual property and data (rights which may be invoked to expand access) is to review each contract.

The records sought will also enable the public to better quantify taxpayers' contributions to publicly-funded COVID-19 vaccines and other technologies, which is of interest to the public[5]

---

[3] *See, e.g.*, Bob Woods, *National drug shortage crisis hits Covid vaccine rollout*, CNBC (Jan. 29, 2021), https://www.cnbc.com/2021/01/29/national-drug-shortage-crisis-hits-covid-vaccine-rollout.html.

[4] Kathryn Ardizzone, *Other Transaction Agreements: Government Contracts that Eliminate Protections for the Public on Pricing, Access and Competition, Including in Connection with COVID-19 Vaccines and Treatments,* June 29, 2020, https://www.keionline.org/wp-content/uploads/KEI-Briefing-OTA-29june2020.pdf, at pgs 5-9.

[5] *See, e.g.*, *Remdesivir, Given to Half of Hospitalized Covid Patients in U.S., Is Big Win for Gilead — Boosted by Taxpayers*, Kaiser Health News (Jan. 28, 2021), https://khn.org/news/article/remdesivir-given-to-half-of-hospitalized-covid-patients-in-u-s-is-big-win-for-gilead-boosted-by-taxpayers/.

and relevant to how the government and contractors should respond to shortages and price their products.

Defendants make a failed attempt to distinguish *Clemente* on the basis that the requester was dying, but that is an inconsequential distinction. KEI is a nonprofit organization that promotes access to affordable medicines and is not dying, but people are dying every day due to a lack of access to taxpayer funded vaccines and treatments. The fact that other people who may be impacted by the processing rate are dying and not KEI is of no consequence:  the longer this goes on, the more people die, and the more losses accumulate. What matters is, this request is time-sensitive. Those who remember the AIDS/HIV crisis in Africa and untold millions of deaths that occurred because of patients' inability to access or afford effective treatments understand that as long as access to COVID-19 vaccines and treatments is artificially limited, people who would not otherwise have to die will die, because manufacturers with monopolies are not able to meet the worlds' needs, and because some countries cannot pay the right price. So yes, KEI is not dying. But millions of people are dying, and will continue to die, until access is universal. That is what this request is about, that is what KEI explained to Defendants, and that is what Defendants wholly fail to appreciate in their submission, stating instead without any factual basis that this request is self-serving.

Defendants also cite *Clemente* for the proposition that 5,000 pages per month would not be ordered in the ordinary case, implying that this request for contracts urgently needed to inform the public about the government's response to a once-in-a-century pandemic is "ordinary". KEI wholeheartedly disagrees, and asserts that 500 pages per month is not adequate *because* this case is not ordinary, and because HHS acknowledged KEI's entitlement to expedited processing, and for the other reasons explained below.

Defendants' only reference to a case in which the Court ordered a production rate of 400 pages per month is impertinent, misleading, and disheartening. In *American Immigration Council v. United States Department of Homeland Security*, the court *granted* a *plaintiff's* motion for a preliminary injunction where the *plaintiff* and not the defendant requested a processing rate of 400 pages per month because only 800 pages were outstanding. *See Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 39 (D.D.C. 2020). Production would finish in two months.

Here, KEI has identified *at least* three to five times that amount for Defendants and likely much more than that. If the Court adopts Defendants' proposal, the parties will not even conclude production and begin briefing redactions for records first sought in the spring of 2020 until at least thirteen months from now, meaning that KEI will have to wait at least two years to be heard on a request for which KEI was granted expedited processing (the first request mentioned in the pleadings).

Defendants further attempt to distinguish *Clemente* on the facts that KEI is not alleging widespread corruption and that the request for which a faster rate of production was ordered did not involve a personal interest. First, allegations of corruption do not have to be shown in order to show that an issue is time-sensitive and of widespread public interest, but KEI's reporting on the contracts has shown that the U.S. government has used a loophole to weaken important legal safeguards at a time when it is allocating unprecedented amounts of taxpayers' dollars and responding to a public health emergency, and this information is suggestive of possible corruption.

KEI finds it to be astonishing that Defendants argue and assert that the cases in which a faster rate of processing was ordered are inapposite to the instant matter because the requests in those cases did not involve personal interests, and KEI's requests do.

b. KEI has disseminated and will continue to disseminate to the public on a timely basis the records sought in this lawsuit and its analysis thereof, and has a proven track record of using its relationships with the news media to disseminate its findings.

Like the Plaintiff in *Clemente*, KEI has a proven track record of using information obtained from FOIA requests to inform the public of matters of widespread and immediate concern, and this is especially true for COVID-19 and the requests at issue.

On June 26, 2020, KEI obtained six COVID-19 contracts in response to the first FOIA request at issue in this lawsuit.  On July 1, 2020, KEI published both the contracts and its analysis of the records.[6] KEI reported that most of the contracts were OTAs that weakened important legal safeguards provided in standard government contracts.[7] Starting on July 1, 2020, news outlets such as the *Washington Post* and *Axios* covered KEI's analysis.[8] The next day, several members of Congress questioned the heads of the National Institutes of Health and Biomedical Advanced Research and Development Authority (BARDA)—the division of HHS

---

[6] James Love, *KEI receives seven new contracts for COVID 19 research from BARDA and DOD, including five using "Other Transactions Authority" that weaken or eliminate Bayh-Dole and FAR Safeguards* (July 1, 2020), https://www.keionline.org/covid19-ota-contracts.

[7] *Id.*

[8] Sharon Lerner, *The Trump Administration if Waiving the Public's Right to Affordable Coronavirus Treatments*, The Intercept (July 1, 2020), https://theintercept.com/2020/07/01/coronavirus-treatment-drug-contracts-trump/; Bob Herman, *Federal government weakened its march-in rights for coronavirus drugs*, Axios (July 1, 2020), https://www.axios.com/federal-government-barda-contracts-moderna-regeneron-aaf9fde2-2ee1-46fb-8465-0d573e6af1ed.html; Jonathan Gardner, *Federal coronavirus contracts dodge pricing oversight, advocacy group says*, BioPharma Dive (July 1, 2020), https://www.biopharmadive.com/news/coronavirus-contracts-dodge-pricing-oversight/580896/; Christopher Rowland, *Trump administration makes it easier for drugmakers to profit from publicly funded coronavirus drugs*, Washington Post (July 1, 2020), https://www.washingtonpost.com/business/2020/07/01/vaccine-coronavirus-barda-trump/; *See, e.g.*, Jake Johnson *'A Scandal': Contracts Show Trump Giving Big Pharma Free Rein to Price Gouge Taxpayer-Funded Coronavirus Drugs*, Common Dreams (July 2, 2020), https://www.commondreams.org/news/2020/07/02/scandal-contracts-show-trump-giving-big-pharma-free-rein-price-gouge-taxpayer-funded;

responsible for the contracts—as to why the contracts weakened important public interest provisions,[9] and the contracts were discussed in later hearings[10]

Next, by reviewing the Moderna vaccine research and development contract produced in response to that same FOIA, KEI learned that the contract required Moderna to publicly state the total and proportionate contribution of the U.S. government to the vaccine and that Moderna was not complying with this obligation.[11] KEI disseminated this information to the public through the news outlet *Axios*[12] and used this information to urge HHS to enforce the contract term.[13] Shortly thereafter, Moderna disclosed that the U.S. government is funding 100 percent of the development of its vaccine,[14] a fact cited by public interest groups in advocating for Moderna to share its vaccine IP and technical data. After the information was released, Moderna announced that it would not enforce its COVID-19 vaccine patents.[15] KEI will continue to use the contracts to ascertain the cost-sharing between the United States government and the contractors and the extent to which taxpayers shouldered the burden of de-risking and financing investments.

---

[9] *Hearing of the Senate Appropriations Subcommittee on Labor, Health and Human Services, Education, and Related Agencies on COVID-19 Vaccine Developmen*t, (July 1, 2020), https://www.c-span.org/video/?473450-1/covid-19-vaccine-development#.

[10] *See, e.g.*, Emily Kopp, *Lawmakers ask about potential COVID-19 vaccine cost, efficacy*, Rollcall (July 21, 2020), rollcall.com/2020/07/21/lawmakers-ask-about-potential-covid-19-vaccine-cost-efficacy.

[11] *See* https://www.keionline.org/misc-docs/FOIA/BARDA-ModernaTX-Contract-75A50120C00034-16Apr2020.pdf at 43.

[12] *See* Bob Herman, *Moderna skirts disclosures of coronavirus vaccine costs*, Axios (Aug. 5, 2020); https://www.axios.com/moderna-barda-coronavirus-funding-disclosure-2775a517-a775-485a-a509-b6906c8535a9.html.

[13] Kathryn Ardizzone, *BARDA Responds to KEI, Public Citizen Letter Asking BARDA to Enforce Moderna Contract* (Aug. 5, 2020), https://www.keionline.org/33633.

[14] Press release, *Moderna Announces Supply Agreement with U.S. Government for Initial 100 Million Doses of mRNA Vaccine Against COVID-19 (mRNA-1273)* (Aug. 11, 2020), https://investors.modernatx.com/news-releases/news-release-details/moderna-announces-supply-agreement-us-government-initial-100.

[15] Robert Langreth and Susan Decker, *Moderna Won't Enforce Covid Vaccine Patents During Pandemic*, MSN (Oct. 8, 2020), https://www.msn.com/en-us/money/companies/moderna-won-t-enforce-covid-vaccine-patents-during-pandemic/ar-BB19Pabv).

Beginning in the fall of 2020, KEI has been quoted in major news outlets such as *National Public Radio* for its analyses of the IP and data terms of the Operation Warp Speed (OWS) vaccine purchase agreements.[16]

KEI will continue to use the contracts to inform the public of how the United States government has or has not protected their interests in rapidly- and widely-available COVID-19 technologies. KEI will also use the contracts to assess the options for broadening access to COVID-19 technologies and scaling up their production; disseminate information about the agreements to Congress, international bodies such as the World Health Organization, NGOs, and public interest groups; and advocate for the use of any contractual options that mays prove effective in increasing the availability of effective COVID-19 medical products.

KEI maintains a publicly-accessible  repository of the contracts at https://www.keionline.org/covid-contracts, and a publicly-accessible spreadsheet of metadata and comparisons of important IP, data, pricing, and access terms, available at https://docs.google.com/spreadsheets/d/16QIr3flPfxHX0XQWTblRmYTXiUY7m3DSEy8rHUlI ic0/edit?usp=sharing. The spreadsheet has been reviewed by journalists, members of Congress

---

[16] Sydney Lupkin, *Prices For COVID-19 Vaccines Are Starting To Come Into Focus*, NPR (Aug. 6, 2020), https://www.kpbs.org/news/2020/aug/06/prices-for-covid-19-vaccines-are-starting-to-come/; Sharon Lerner, *Trump Sets Up Pharma Billionaires for Coronavirus Pay Day*, The Intercept (Oct. 23, 2020), https://theintercept.com/2020/10/23/trump-covid-19-pharma-regeneron-coronavirus-treatment/; Sydney Lupkin, *A Federal Government Coronavirus Vaccine Contract At Last, But Redactions Obscure Terms*, NPR (Oct. 24, 2020), https://www.npr.org/sections/health-shots/2020/10/24/927474041/a-federal-coronavirus-vaccine-contract-released-at-last-but-redactions-obscure-t; Sydney Lupkin, *Federal Supply Deal For COVID-19 Antibody Treatment Lacks Some Customary Protections*, NPR (Nov. 6, 2020),  https://www.npr.org/sections/health-shots/2020/11/06/931795256/federal-supply-deal-for-covid-19-antibody-treatment-lacks-some-customary-protect; Sydney Lupkin, *HHS Released More Coronavirus Vaccine Contracts As Election Results Unfolded,* NPR (Nov. 8, 2020),  https://wamu.org/story/20/11/08/hhs-released-more-coronavirus-vaccine-contracts-as-election-results-unfolded/; Sydney Lupkin, *Novavax posts coronavirus vaccine contract that government didn't disclose*, NPR (Nov. 11, 2020), https://www.opb.org/article/2020/11/11/novavax-posts-coronavirus-vaccine-contract-that-government-didn-t-disclose/; Sydney Lupkin, *Pfizer's Coronavirus Vaccine Supply Contract Excludes Many Taxpayer Protections*, NPR (Nov. 24, 2020), https://www.npr.org/sections/health-shots/2020/11/24/938591815/pfizers-coronavirus-vaccine-supply-contract-excludes-many-taxpayer-protections.

and activists groups. KEI will continue to update the repository and spreadsheet and disseminate its analyses through various media outlets as soon as KEI obtains the outstanding records.

    c.   The Court should require HHS to produce 5,000 pages per month because HHS has granted expedited processing of some of the requests at issue in this lawsuit, and all requests are entitled to expedited processing because they are identical in all material respects.

Expedited requests must be processed "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii). As such, in this jurisdiction, when a request is entitled to expedited processing, a faster processing rate than the standard 500 pages per month is appropriate. Conversely, in every single one of the cases cited by Defendants in which the Court upheld the agency's proposal of 500 pages per month, the request was not entitled to expedited processing, and in some of the cases, the Court based its decision in part on that fact. *See, e.g.*, 2020 WL 7419670 at *1 (approving 500 pages per month where "Plaintiff [did not] claim that he [wa]s entitled to expedited processing"); 297 F. Supp. 3d at 186 ("Plaintiff has not shown here that Defendant can or should process documents at a rate faster than 500 per month. For example, it has not asserted that it is entitled to expedited processing under FOIA"); *Daily Caller News Found. v. FBI*, 387 F. Supp. 3d 112, 121 n. 2 (D.D.C. 2019)(noting that Plaintiff was denied expedited processing).

   The HHS Declaration fails to acknowledge that the records covered in KEI's outstanding requests were granted expedited processing.

HHS granted expedited processing for many of the requests at issue, including the main HHS request outstanding, 2021-00130-FOIA-OS (the October 20, 2020 request for the outstanding HHS COVID-19 contracts), recognizing the fact that KEI demonstrated a compelling need. *See* Dkt. No. 1 ¶¶ 11, 36 and Dkt. No. 14 ¶ 73 . There is no material difference between a request for which HHS granted expedited processing and a request at issue in this lawsuit where HHS or the Army was either silent or denied the request. Each of the 14 requests

at issue in this lawsuit pertain to (1) contracts (2) executed by the United States government (3) for the development or purchase of a COVID-19 technology (4) during the pandemic. *See* Dkt. No. 14. Accordingly, HHS and the Army have an obligation to produce the records "as soon as practicable", and not merely on a first-in, first-out basis. KEI is entitled to primacy over non-expedited requests. Defendants' proposals are not reasonable because they give no consideration for KEI's compelling need, and because Defendants have not provided information needed to validate them *(i.e*., how many expedited versus non-expedited requests are outstanding, how many pages are responsive, and how long it would take the agencies to produce those pages at Defendants' proposed rate).

Moreover, in some respects, the agencies have not been diligent. When the parties conferred on February 1, 2021, Defendants' counsel said that he did not realize that KEI's interest in the contracts was not limited to the ones that KEI asked Defendants to produce in the "next batch."  The Army refused to recognize the October 20, 2020 request submitted to the Army until KEI requested that it search the inbox for an email address that the Army lists as an acceptable point of contact for submitting a FOIA request. Even after gaining additional time to respond to the October 20, 2020 FOIA request for all Army COVID-19 contracts, the Army still has not conducted a search and determined a total page number count and timeline of production, nor has HHS.

HHS maintains that it cannot produce the Johnson & Johnson ("J&J") vaccine contract, which was first requested by KEI on March 25, 2020, until April 30, 2021, more than a year after KEI first requested it (and was granted expedited processing). The March 25, 2020 FOIA request for the J&J vaccine contract is not included in this lawsuit but is relevant to HHS's unreasonable delay. HHS maintains that it cannot produce the J&J vaccine contract until April 30, 2021

because it did not notify J&J of the request for this contract until January of 2021. However,

HHS had at least two occasions to notify J&J of this request starting last spring. First, KEI

submitted the March 25, 2020 request seeking only this contract. Next, on April 9, 2020, KEI

submitted Request No. 2020-00968-FOIA-OS to HHS, seeking six HHS COVID-19 contracts

(including the J&J vaccine contract), the majority of which were contracts that predate COVID-

19 but were amended to encompass COVID-19 vaccines or treatments. It is important to have

access to the original agreement because if an amendment does not alter a term in the original

contract, the original term is controlling. For four of the six contracts requested, HHS provided

the underlying agreement and 2020 amendments, but it did not produce the original J&J vaccine

contract. KEI appealed, and still has not heard back from HHS. HHS now argues that the request

for six contracts did not pertain to both the original agreement and amendments, and that is why

it has not yet produced the J&J vaccine contract. Yet, that assertion is not credible, because HHS

produced the underlying agreement in addition to the amendments for four of the six contracts

produced by HHS for the same FOIA request. In August of 2020, after HHS stated that it was

waiting on J&J regarding the March 25, 2020 FOIA, KEI received a final response letter denying

the request in full on the purported (and false) basis that HHS had already provided the contract

to KEI in response to the April 9, 2020 request. KEI appealed that denial as well as that of the

April 9, 2020 request and produced evidence to HHS that it never received the contract. So it is

unreasonable that HHS did not even notify J&J that KEI was seeking the contract until January

of 2021.

KEI seeks to ascertain the terms of the J&J vaccine contract because the Johnson & Johnson vaccine candidate uses a technology that is easier to produce in low-income countries,[17] and thus the terms of the contract may help expand access for the poor.

In addition to failing to mention it in their declarations, Defendants give only a quick nod to expedited processing in their position statement in this status report, stating in a footnote that the fact that a request has been granted expedited processing does not in and of itself mean that a party is entitled to the production of all records sought within a narrow timeframe. Defendants' argument and the authority on which it relies do not establish that KEI is not entitled to a faster processing of its FOIA requests. Quite to the contrary, the cases cited by Defendant actually support the idea that Plaintiff is entitled to speedier production. In *Protect Democracy*, the plaintiff asked the Court to order Defendants to produce all responsive records by a date certain and that the defendants produce responsive records on an expedited basis. *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 296 (D.D.C. 2017). The Court granted the plaintiff's request for expedited production, noting that "FOIA's 'expedited processing' provision recognizes that some requests are urgent enough to warrant a spot towards the front of the line." *Id.* at 296. Like the request that was granted in *Protect Democracy*, KEI is not requesting production of all responsive records within a date certain but merely expedited production. Four hundred pages per month when there are thousands of pages outstanding and even non-expedited requests are typically afforded at least 500 pages per month in this circuit is not expedited production.

---

[17] Megan Twohey, Keith Collins and Katie Thomas, *With First Dibs on Vaccines, Rich Countries Have 'Cleared the Shelves'*, N.Y. Times (Dec. 15, 2020), https://www.nytimes.com/2020/12/15/us/coronavirus-vaccine-doses-reserved.html.

Defendants also are helpful in quoting *Protect Democracy* for the proposition that "[i]n cases where expedited processing has been granted, it follows that the district court's supervision will aim to ensure that the agency is processing a request with 'due diligence' and as quickly 'as practicable.'" KEI agrees; KEI has been granted expedited processing, and the Court's supervision is needed here.

KEI also notes that its request for an accelerated processing rate is not the type of argument or request that this Court has rejected. KEI has not argued that because Defendants failed to produce all responsive records within 20 days of the request, they must thus produce them all within 20 days, as did the plaintiff in *Electronic Privacy Information v. Department of Justice*, 15 F. Supp. 3d 32, 35 (D.D.C. 2014). KEI merely seeks an accelerated rate of production in keeping with the expedited processing to which the requests at issue are entitled, KEI's consistent record of quickly disseminating the information sought to the public, and the fact that the records are requested in order to quickly inform the public about the pandemic response in time to impact that response in a positive manner and save lives, which are perishing each day.

Defendants have failed to appreciate KEI's public-facing intent and record of disseminating information to the public or the extraordinary nature of this litigation, despite overwhelming evidence to the contrary. Defendants are proposing a rate of production that would only be appropriate in the ordinary course. KEI believes it goes without saying that this is not the ordinary course, but has nonetheless attempted to make that abundantly clear in this submission.

d.  An accelerated production schedule will compliment, rather than detract from, other FOIA requesters.

KEI appreciates that HHS has received a large number of FOIA requests since the onset of COVID-19, but this fact actually supports accelerating the processing schedule.  Because KEI

will promptly make the additional records available to the public for inspection and disseminate its analyses to the public, the public interest will be served rather than diminished by accelerating the rate of production. It may well turn out that the accelerated response time will conserve agency resources and reduce the number of outstanding requests because once HHS and the Army also publish the contracts in their reading rooms after providing them to KEI, they may direct requesters to the online copies. These are considerations that Defendants do not address and thus do not factor out in their Declarations. Defendants do not, for example, acknowledge in their respective declarations that there is overlap between the contracts sought in this litigation and the influx of COVID-19 related requests, even when the potential for that overlap is obvious.

If HHS and the Army produce only 400 pages per month, it will take *at least* another eight to thirteen months before production is finalized and possibly much more than that. Between now and then, if Defendant's proposal is adopted, KEI, members of the public and other public interest groups will have to advocate for broader access to and the scaling up of the manufacturing of COVID-19 technologies without full knowledge of the contours and limits of the contracts. Activists and public interest groups will be denied a complete set of information that can be used to support arguments for the sharing of patents and know-how, and the public's ability to assess the performance of the government in representing their interests in negotiating contracts will be stymied, defeating the intent of the FOIA to create an "informed citizenry" when there can be no doubt that the citizenry desires to be informed about the terms of the contracts.  The government's response to COVID-19 is happening on the ground, right now. The questions that the contracts will answer include, but are not limited to, the following questions:

1. Does the government have the power to license the relevant patents to another manufacturer to expand manufacturing capacity?

2. What happens if a vaccine manufacturer does its best to produce the vaccine timely, but falls short because of inevitable constraints? May it still block other companies from stepping in and making a generic version while people die?
3. Does the government have the power to transfer technical data and know-how to another manufacturer to expand manufacturing capacity?
4. How much did taxpayers, as opposed to the contractors, contribute to the development of the technologies?
5. What obligations do the companies have regarding the transparency of the agreements?
6. What happens if the contractors fail to ensure adequate supply?
7. Does the government obtain any rights in the background intellectual property need to manufacture the technologies?
8. What happens if the contractor misses a deadline to deliver a vaccine or treatment to the government?
9. Do the contracts impose any pricing constraints?
10. Do the contracts invoke the Defense Production Act?

e. The Army is not entitled to a presumption of good faith for its assertion that having Army FOIA personnel review additional pages each month "may take away from" the Army's ability to carry out its mission.
Given the exceptional countervailing public interest in the timely dissemination of the

records sought, KEI seeks to learn more about the Army's generalized and conclusory assertion

that having Army FOIA personnel process additional pages per month may appreciably divert

the attention of Army contracting officers. For example, what role, if any, does a contracting

official serve in responding to a FOIA request and reviewing responsive records, and why cannot

that role be performed by the FOIA staff? KEI can only imagine that a contracting officer might

be needed to locate responsive records—but KEI itself has satisfied that need. KEI worked

diligently to use publicly available sources and databases such as FPDS to provide the Army

with a list of contracts to produce, including their contract number, date, amount, and subject.

Accordingly, if the role of the contracting officer is to locate a responsive contract (and KEI is

not sure why this cannot be performed by a FOIA officer), this is something that is largely if not

entirely obviated by KEI's list. KEI is open to further cooperating with the Army regarding the

scope of the request in order to minimize any diversion of resources, but it cannot do so unless it

knows more about why an Army contracting officer would have to devote a detrimental amount

of time to reviewing the FOIA records when other personnel have been retained exclusively to

do that job. Statements such as these are not afforded a presumption of good faith unless more

detail is provided. KEI respectfully submits that this is an issue that deserves a much more

fulsome explanation. Agency affidavits in FOIA cases must be "relatively detailed and non-

conclusory." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020).

F. The HHS Declaration creates a misleading picture of its workload regarding this request
and does not consider the context or KEI's entitlement to expedited processing of the
remaining contracts at issue.

KEI had only a narrow window of time to review Defendants' declaration, as they were

provided to KEI the day of this filing. Even with its limited time to review the HHS Declaration,

KEI has identified issues and areas in which HHS fails to support its position.

The Declaration misleadingly emphasizes how HHS will need to engage subject matter

experts to perform the supposedly difficult job of identifying and locating responsive contracts,

omitting the fact that KEI provided HHS with a list of responsive contracts identified by number,

product, date, and amount.

The Declaration that "HHS has to rely on the subject matter experts to locate all of those

documents [.]" Gaylord Decl. ¶ 10. Elsewhere, it states further:  "The unavailability of

custodians and subject-matter experts makes it difficult to craft targeted searches, which results

in the FOIA Office relying on electronic searches that produce immense volumes of data." *Id.* ¶

35.

KEI cannot speak to HHS's staffing but it can speak to the nature of the request and the

steps KEI has taken to provide HHS with information that obviates the need for complex

searches. The request to which HHS's statement refers is not open-ended, although it does

involve dozens of records. Request No. 2021-00130-FOIA-OS seeks "all contracts in BARDA's

COVID-19 Medical Countermeasure Portfolio,

https://medicalcountermeasures.gov/App/barda/coronavirus/COVID19.aspx, except ones that are

covered by another HHS FOIA request." Dkt No. 14 ¶ 71. After learning that HHS had not yet

started a search of responsive contracts and that it had not looked at the BARDA COVID-19

Medical Countermeasure Portfolio webpage, and after Defendants' counsel asked if the website

was listed in the pleadings, KEI decided to go above and beyond to help facilitate HHS's

processing. KEI provided HHS with a list of contracts that KEI is seeking, identified by contract

number, date, amount, and subject. Even with the asymmetry of information between KEI and

HHS, KEI still was able to identify the contract numbers for 57 of the outstanding contracts.

Moreover, HHS does not have to second guess search terms even when it does not have the

contract number:  the name of the contractor, date, and amount, information which KEI also

provided using the BARDA webpage, should suffice.

 The HHS Declaration also attempts to create the impression that gathering and locating

responsive records is a long process by stating that "Plaintiff's 'catchall' request [which was

submitted in October and granted expedited processing] covers approximately 76 contracts,

including amendments, modifications, appendices, or attachments to those contracts, except

those that have already been released. HHS has to rely on the subject matter experts to locate all

of those documents." Gaylord Decl. ¶ 10.  Yet "amendments" and "modifications" are the same

thing, and since HHS knows the contract number for most of the contracts, it can easily

determine the date, number, and existence of any amendments even using public databases. KEI

is happy to assist.

 If the Court believes that the HHS Declaration has any merit, KEI requests that the Court

set a briefing schedule and/or hearing on the processing rate dispute, and ask HHS to explain the

difficulty or time it takes to locate a document when it has been identified by contract number and explain why it believes it has to conduct open-ended searches.

The HHS Declaration also confirms what KEI expected when devising its processing rate proposal: that the "COVID FOIA surge" was caused primarily by requests "directly related to the pandemic" and that the "HHS OS FOIA Office is now besieged by incoming FOIA requests relating to COVID-19". *Id.* ¶¶ 20, 33. KEI has already explained how a high processing rate in this case, which is focused on HHS COVID-19 contracts, will serve the interests of other requesters who almost certainly have submitted substantially similar requests.

Also noteworthy, the HHS Declaration establishes that HHS can, in fact, produce much more than 400 pages per month. HHS has only five to ten of the outstanding lawsuits that still require document production. *Id.* ¶ 26.  HHS has produced "1,500 pages per month" and "a much higher rate". *Id.* ¶ 27.

Finally, the HHS Declaration also emphasizes the disruption caused by teleworking. KEI can imagine that teleworking initially caused a disruption, but a year into this pandemic, it is hard to imagine how that could still be the case. All databases/records are electronic. The Declaration speaks to the need to retrieve "large volumes of data" but the average count of COVID-19 contracts produced by HHS thus far, including amendments, is 68 pages, and the need to retrieve data is also tied in the declaration to a non-existent need to perform sweeping searches. Does HHS mean to assert that opening a 68-page long PDF substantially slows down its research? How? If, on the other hand, HHS's statements were focused on other requesters, they do not establish why processing another 600 to 4600 pages per month would materially impact its operations when that appears to be a small part of its overall FOIA production.

In sum, KEI's proposal of 5,000 pages per month for the HHS and 3,000 pages per month for the Army (unless KEI's redactions briefing schedule proposal is implemented) is reasonable and supported by case law when the records are time sensitive and of widespread public interest, KEI has a strong track record of informing the public about the records, the requests were granted expedited processing or were otherwise entitled thereto, and the production rate will also serve other requesters.

## B. BRIEFING REDACTIONS CONCURRENT WITH PRODUCTION

### 1. Proposal

KEI proposes that the Court enter a briefing schedule that would allow the parties to dispute redactions in the contracts thus far produced before production is completed.

KEI proposes the following schedule:

- March 5, 2021 (or 30 days from the date of the Court's order): Defendants produce *Vaughn* indices.
- March 20, 2021,  deadline for KEI to file its motion for summary judgment.
- March 30, 2021, deadline for Defendants to file their oppositions and cross motions.
- April 5, 2021,  deadline to file a reply to Defendants' oppositions.
- April 10, 2021, deadline to file an opposition to Defendants' cross-motions.
- April 15, 2021, deadline to file Defendants' reply to Plaintiff's opposition to their cross-motion, and date that the parties submit their briefs in one package to the Court.

### 2. Justification

"The FOIA imposes no limits on courts' equitable powers in enforcing its terms." *Payne Enterprises, Inc. v. United States et al.*, 837 F.2d 486, 494 (D.C. Cir. 1988) (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974)).

Delaying resolution of the redactions to the already-produced contracts by at least thirteen months would dilute the contracts' informational value and frustrate the intent of the FOIA. To put it simply, the informational value of the contracts is time-sensitive. The value of the information is the ability to inform the public and influence the public debate about the U.S.

government's pandemic response when there is still time to influence the response and advocate for scaling up manufacturing and broadening access. For example, if the contracts reveal, as some of them have, that the government is weakening important legal safeguards by using OTAs, then the value of the information would be the ability to influence the public discourse on whether negotiating contracts of that nature in a pandemic is appropriate, and the possibility that such discourse may countenance against the continued weakening of such rights (the Army asserts that it is still executing more contracts). As another example, if Op-Eds, and letters to the editor, and activist groups, news articles, commenters on news articles, tweets, and in-depth analyses all debate how to get more shots in the arms of more people more rapidly—which they do[18]—then the informational value of the contracts is providing information that bears on what actions the government may take to expand vaccine access, in such time as to advocate for government officials to utilize those options in order to minimize the harm caused by the pandemic. Of course, in this country, it is elected officials who make policy decisions, but the public has a voice that can influence the actions they take. An informed citizenry is vital to our democracy.

The informational value is weakened every day that the pandemic goes on, decisions are made, policies are implemented, and contracts are executed. The informational value is also diluted every day that more people die, because the underlying intent behind pursuing this information is to save lives.

---

[18] *See, e.g.*, Katie Thomas, *U.S. Covid Vaccine Supply: How to Make Sense of Those Confusing Numbers*, N.Y. Times (Jan. 21, 2021), https://www.nytimes.com/2021/01/21/health/covid-vaccine-supply-biden.html; Letters to the Editor, *Opinion: Coronavirus vaccine availability and access are key*, Wask. Post. (Jan. 25, 2021); https://www.washingtonpost.com/opinions/letters-to-the-editor/coronavirus-vaccine-availability-and-access-are-key/2021/01/25/fa1bd034-5c3c-11eb-a849-6f9423a75ffd_story.html.

The redactions largely obscure the meaning of contracts first requested by KEI in April of 2020, and that is a main thrust of KEI's proposal. The redactions to the first six contracts produced by HHS, for example, were at best careless or negligent and at worst were in bad faith because they redact information that the government had already made public in the press releases announcing the contracts and government databases, *i.e.*, the total amount of the contracts.[19] In other places, entire pages of amendments to the contract are blacked out.[20] This makes it impossible to know for certain whether any of the amendments to the contracts modify important terms in the original agreements.

 If the Court does not adopt KEI's proposal, that would mean that a FOIA requester can be required to wait two years to learn the full meaning of records, when the underlying request pertains to a public health emergency and was granted expedited processing. This will not do. As the Army asserts in its declaration, it is executing contracts for COVID-19 technologies right now and in the near future. The public has a right to know, before further contracts are executed, how effectively or not the Army and HHS are representing its interests at the negotiating table and whether they are maximizing avenues for expanding access.

Second, resolving all the parties' redaction disputes in one batch of motions would be highly impracticable, as by KEI's counts there are at least 80 HHS contracts and 87 Army contracts covered in this lawsuit and KEI intends to litigate the redactions in most, if not all, of the redactions in the contracts. Importantly, litigating the redactions in one batch will not serve judicial economy because the issues the Court will have to resolve will not be more expediently

---

[19] *See, e.g.*, Agreement No. HHSO100201800012C as produced by HHS, https://www.keionline.org/misc-docs/FOIA-BARDA-J&J-OTA-HHSO100201800012C-21Sept2018.pdf.

[20] *See, e.g.*, HHSO100201700018C (P0007), https://www.keionline.org/misc-docs/FOIA-BARDA-J&J-OTA-HHSO100201700018C-Amendment7-20Mar2020.pdf, at pages 19 to 21.

resolved if the redactions are contested all at the same time in the same motion. The redactions that KEI is challenging invoke Exemption 4 of the FOIA, which is a highly company-specific and fact-specific exemption, because it factors in the practices of the company, the nature of the redacted information, and, as a result of the FOIA Improvement Act of 2016, whether the release of the requested information will harm an economic or commercial interest of the information's source. *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019).  Each  redaction will have its own analysis. And while judicial economy will not be served by waiting, litigating redactions to 160 contracts and their amendments at the same time might result in thousand-page long summary judgment motions, which would be unwieldy, in addition to prejudicing KEI's right to the information withheld on a timely basis.

Finally, the case Defendants offer in support of their position lacks persuasive or informative value and is misrepresented by Defendants. *Republican National Committee v. United States Department of State* is fact-specific and makes no sweeping conclusions of law or observations of legal principles. There, the Court's decision was grounded in the fact that the plaintiff requested a briefing schedule for just 16 pages of records when at least 15,000 pages, nearly 100 times that amount, remained outstanding; the fact that the parties previously agreed to briefing after production; and the fact that the records involved common Exemption 6 privacy issues for the president's calendars, which may have been much less redaction-specific because the party impacted by the release was always the same. *Republican Nat'l Comm. v. U.S. Dep't of State*, No. 16486, 2016 WL 9244625 (D.D.C. Sept. 16, 2016). Defendants edited a quote from that case so as to make it sound like the case stood for a principal of law applicable to all FOIA requests when it did not. *Republican National Committee* does not assert that "("[T]he most appropriate time for summary-judgment proceedings [in a FOIA case] would be after the final

production is delivered." By inserting "in a FOIA case", Defendants make it seem like the Court observed a legal principle applicable to all FOIA cases, when instead, the Court draws a conclusion that is rooted in the facts of the case. Defendants have hardly drawn a trend line, courts enter preliminary orders in FOIA cases all the time, and it is well within the Court's powers to do so here.

Furthermore, the court in the case cited by Defendants noted the parties' previous agreement "that the most appropriate time for summary-judgment proceedings would be after the final production is delivered."  Here there was never any such agreement. KEI raised this issue promptly, in the first joint status report. *See* Dkt. No. 13.

Lastly, and most importantly, the Court in *Republican National Committee* was not confronted with, let alone did it not consider, exigent circumstances as are present here. Context is critical, and cannot be overlooked, in this litigation. It makes little sense to object to the briefing schedule that KEI is seeking without first considering the compelling reasons that such a schedule is warranted.  Defendants do not understand KEI's position on why the records will lose informational value over time, wrongly asserting that KEI is focused on the fact that the records are newsworthy. This is tone deaf and not rooted in any facts. KEI informed Defendants' counsel as follows:

> [P]eople are dying all over the world and in the US because of [] vaccine and other shortages. The contractual terms inform what options the government may exercise in order to broaden access, and the extent to which the government funded the technologies, among other important data. Right now, capable manufacturers aren't able to make extra vaccine doses because of the companies' monopolies on IP and know-how. The contracts likely contain pertinent information, and KEI has already used information in contracts obtained from requests at issue in this lawsuit  to influence the public debate.

KEI also explained to defendants how the non-uniformity of the contracts and fact that they weaken standard rights in IP and data heightens the urgency of obtaining them.

Even if Defendants did not believe or heed KEI's statements, HHS should have at least heeded its own conclusions, made on multiple occasions, that KEI demonstrated that there was a "compelling need" to obtain the contracts and was entitled to expedited processing. To attempt to diminish that interest now as a concern over "newsworthiness" is simply not in line with any facts.

In sum, litigating the redactions on these contracts now not only will better preserve the informational value of the redacted information, but it will also make the final summary judgment briefing after the conclusion of production much more manageable.

One final consideration of the Court in the case cited by Defendants, which need not be an issue here, is the Court's understandable desire to avoid a constant and piecemeal litigation process; for example, a monthly briefing schedule is a concern cited in *Republican National Committee*. KEI can assure this Court that it would never seek a monthly briefing schedule on the redactions to any newly-produced contracts. While waiting two years to be heard on some of the redactions to already produced records would be an excessive amount of time and defeat the purpose of the FOIA, the same is not true for the contracts yet to be produced. A processing rate of 1,000 pages per agency per month (the rate KEI requests if the parties may brief the first round of redactions now) likely would not constitute undue delay. As such, KEI is proposing two sets of redaction-related briefing: the one that takes place now, for the contracts that have already been produced, and the only that occurs after final production.

A note on the hardship cited by Defendants: The *Vaughn* indices, by Defendants own calculations, will take only 45 days to produce. After that, Defendants' counsel and not its FOIA officers will brief the redaction dispute and as such, there will be no partial diversion of resources. KEI took into account the temporary overlap in some resources alleged by Defendants

in proposing the 1,000 pages per month versus 5,000 processing rate, if the Court enters either of the parties' proposed briefing schedules.

## DEFENDANTS' STATEMENT

Both HHS and the Army have been working to process the records sought in this case, both before and after the lawsuit was filed. Many of the records have already been processed and posted publicly on the HHS website as proactive disclosures. Because these records involve the interests of private entities, the process for releasing the records is multi-layered. Once the agencies have located the record, they must first notify the private entities that the records have been sought pursuant to a FOIA request. The private entities then review the records and may request that certain portions be redacted under a FOIA exemption, most commonly Exemption 4 for confidential commercial information. *See* 5 U.S.C. § 552(b)(4); *see also* 45 C.F.R. § 5.42. The agencies then must review the propriety of each requested redaction before they can release the records. If the private entities disagree with any of the agencies' decisions, the agencies may be subject to a reverse FOIA action. *See, e.g.*, *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 305 (D.C. Cir. 1999). Due to this multi-layered process, production of records in this case requires more time than in many other FOIA cases.

The records sought in this case fall into two categories: (1) documents that Plaintiff specifically identified, either in the original FOIA requests or via correspondence with counsel for Defendants; and (2) additional contracts between the federal government and private medical companies that fall within the catchall requests. *See* Second Amended Complaint ("SAC"), ¶¶ 71–75 (HHS catchall request), ¶¶116–22 (Army catchall request). The following list addresses the status of the records in the first category.

1) *BARDA–Janssen/Johnson & Johnson vaccine contract* (SAC ¶ 10(a)): KEI requested this record from HHS on April 9, 2020. HHS produced the amendment, which deals with the development of a COVID-19 vaccine, on June 24, 2020. HHS has not yet produced the underlying contract, which predates the COVID-19 pandemic. HHS is working to complete the redaction process of that underlying contract and anticipates release by April 30, 2021.

2) *BARDA–Sanofi contract* (SAC ¶ 10(b)): KEI requested this record from HHS on April 9, 2020. HHS produced the amendment, which deals with the development of a COVID-19 vaccine, on June 24, 2020.

3) *BARDA–Moderna contract* (SAC ¶ 10(c)): KEI requested this record from HHS on April 9, 2020. HHS produced the contract on June 24, 2020. HHS released a version of this record with fewer redactions on February 5, 2021.

4) *BARDA–Genentech/Roche contract* (SAC ¶ 10(d)): KEI requested this record from HHS on April 9, 2020. HHS produced the contract and amendments to the contract on June 24, 2020.

5) *BARDA–Janssen/Johnson & Johnson treatment contract* (SAC ¶ 10(e)): KEI requested this record from HHS on April 9, 2020. HHS produced the contract and amendments to the contract on June 24, 2020.

6) *BARDA–Regeneron contract* (SAC ¶ 10(f)): KEI requested this record from HHS on April 9, 2020. HHS produced the contract and amendments to the contract on June 24, 2020.

7) *BARDA–Phlow Contract No. 75A50120C00092* (SAC ¶ 29): KEI allegedly requested this record from HHS on May 21, 2020. KEI provided Defendants a copy of the request

on December 14, 2020. (Dkt. No. 15, ¶ 29). HHS has produced the contract, which is publicly available at https://www.hhs.gov/coronavirus/contracts/index.html. KEI's request also seeks communications between HHS and Phlow Corporation. HHS requested that KEI clarify this part of the request, and on January 14, 2021, KEI provided narrowing instructions for the communications search. Searches for communications at HHS are completed by the Office of Chief Information Officer ("OCIO"), rather than the FOIA Office. HHS expects that this search will require more time due to onboarding of personnel. OCIO anticipates being able to complete the initial search for records by March 1, 2021. HHS will be able to process records as part of the 800 pages every other month (described below) once the parties have agreed to a record set (assuming the search produces voluminous results and the Parties need to negotiate the scope further).

8) *HHS–AstraZeneca Agreement No. 75A50120C00114* (SAC ¶ 35): KEI requested this record from HHS on June 5, 2020. HHS produced the contract on August 24, 2020.

9) *HHS–DOD–Novavax vaccine contract* (SAC ¶ 43): KEI requested this record from HHS on July 8, 2020. The record is maintained by Army Contracting Command (ACC), not HHS. The record has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html.

10) *HHS–CIADM at Emergent Biosolutions Contract No. 75A50120F33006* (SAC ¶ 51): KEI requested this record from HHS on July 27, 2020. HHS is working to complete the redaction process and anticipates release on February 11, 2021.

11) *SAb Biotherapeutics Contract No. W15QKN1691002* (SAC ¶ 51): KEI requested this record from HHS on July 27, 2020. The record is maintained by ACC, not HHS. ACC is working to complete the redaction process and anticipates release by March 15, 2021.

12) *Grifols Shared Services North America, Inc. contract* (SAC ¶ 51): KEI requested this record from HHS on July 27, 2020. The record is maintained by ACC, not HHS. ACC is working to complete the redaction process and anticipates release by March 15, 2021.

13) *Moderna amendment, Contract No. 75A50120C00034 (P00003)* (SAC ¶ 56): KEI requested this record from HHS on July 28, 2020. HHS is working to complete the redaction process and anticipates release by April 30, 2021.

14) *BARDA–Pfizer contract* (SAC ¶¶ 60, 91): KEI requested this record from HHS and the Army on July 28, 2020. The record is maintained by ACC, not HHS. The record has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html.

15) *Merck contract*: KEI seeks this record pursuant to the catchall HHS request (SAC ¶ 71). On January 8, 2021, counsel for KEI requested via email that HHS release the "Merck vaccine contract." HHS had told KEI in response that it would work to complete the redaction process and anticipated release on February 5, 2021. HHS mistakenly processed an amendment to the Merck vaccine contract instead, which it released to KEI on February 5, 2021. HHS will work to complete the redaction process for the original contract as quickly as possible.

16) *Novavax demonstration contract* (SAC ¶ 86): KEI requested this record from the Army on July 8, 2020. The record has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html.

17) *Moderna Agreement No. W911QY-20-C-0100* (SAC ¶ 96): KEI requested this record from the Army on August 13, 2020. The contract and amendments to the contract have been produced and are publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html.

18) *HHS–DOD–GlaxoKlineSmith and Sanofi contract* (SAC ¶ 103): KEI requested this record from the Army on October 15, 2020. The contract has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html. KEI has also requested that the Army release amendments to this contract. ACC is working to complete the redaction process and anticipates release of the amendments by March 15, 2021.

19) *Advanced Technology International (ATI) Other Transaction Agreement No. W15QKN1691002* (SAC ¶ 109): KEI requested this record from the Army on October 15, 2020. The contract has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html under the name "MCDC Consortium Base Agreement." KEI has also requested that the Army release attachments to this contract. ACC is working to complete the redaction process and anticipates release of the attachments by March 15, 2021.

20) *Grand River Aseptic Manufacturing, Inc. Agreement No. W911QY-20-C-0086*: KEI seeks this record pursuant to the catchall Army request (SAC ¶ 116). On January 8, 2021, counsel for KEI requested via email that HHS release the "Grand River Aseptic Manufacturing Inc. manufacturing agreement, W911QY-20-C-0086." The contract has been produced and is publicly available at https://www.hhs.gov/foia/electronic-reading-room/index.html.

21) *Cepheid Agreement No. W911QY20P0154*: KEI seeks this record pursuant to the catchall Army request (SAC ¶ 116). On January 8, 2021, counsel for KEI requested via email that HHS release "Cepheid W911QY20P0154." ACC is working to complete the redaction process and anticipates release by March 15, 2021.

22) *Other Transaction Agreement with Inovio*: KEI seeks this record pursuant to the catchall Army request (SAC ¶ 116). On January 8, 2021, counsel for KEI requested via email that HHS release "June 22, 2020 Other Transaction Agreement with Inovio, with Natick." ACC is working to complete the redaction process and anticipates release by March 15, 2021

23) *Inovio contract*: KEI seeks this record pursuant to the catchall Army request (SAC ¶ 116). On January 8, 2021, counsel for KEI requested via email that HHS release "Another Inovio contract executed by Natick." ACC is working to complete the redaction process and anticipates release by March 15, 2021

During the Parties' conferral on February 1, 2021, counsel for KEI reminded counsel for Defendants that KEI intends to pursue not only the above-listed contracts, but any additional contract responsive to the catchall requests (*i.e.* the second category of documents mentioned above). Prior to February 1, Defendants' focus was on the above-listed records. Counsel for KEI subsequently sent counsel for Defendants a non-exhaustive list of 77 records it believes are in HHS's possession that are responsive to the HHS catchall request and a non-exhaustive list of 86 records it believes are in the Army's possession that are responsive to the Army catchall request.

Due to the number of additional records involved, it is not known at this time how many pages of documents will need to be processed. Both HHS and the Army have limited capacity for processing FOIA requests. The attached declaration explains HHS's current constraints, *see* Decl.

of Brandon Gaylord, and the Army's processing capacity is discussed below in response to the Court's questions, *see also* Decl. of Sherrod Davis. Given these limitations, HHS is able to process the additional records at a rate of no more than 800 pages every other month. ACC, the unit in custody of most or all of the additional Army contracts, can process the additional records at a rate of eight "actions" (obligating document such as a contract or a modification) released per month, corresponding to approximately 400 pages per month.[21]

Although Plaintiff has identified some FOIA cases in which agencies have been ordered to process up to 5,000 pages per month, *see Open Soc'y Justice Initiative v. CIA*, 399 F. Supp. 3d 161, 162 (S.D.N.Y. 2019); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014), those cases are outliers. Much more commonly, courts in this district require agencies to process outstanding responsive records at a rate of 500 or fewer pages per month. *See Nat'l Sec. Counselors v. U.S. Dep't of Justice*, 848 F.3d 467, 471–72 (D.C. Cir. 2017) ("By processing requests in 500-page increments, the [FBI's] policy ultimately provides more pages to more requesters, avoiding situations in which a few, large queue requests monopolize finite processing resources."); *Chaverra v. U.S. Immigration & Customs Enf't*, No. 18-289, 2020 WL 7419670, at *1 (D.D.C. Nov. 5, 2020) (ordering 500 pages per month and collecting similar cases); *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 39 (D.D.C. 2020) (ordering 400 pages per month pursuant to a preliminary injunction under FOIA in a COVID-related case); *Daily Caller News Found. v. FBI*, 387 F. Supp. 3d 112, 121 (D.D.C. 2019) (ordering 500 pages per month and rejecting plaintiffs' request for 1,200 pages per month); *Middle E. Forum v. U.S. Dep't of Homeland Sec.*, 297 F. Supp. 3d 183, 185–86 (D.D.C. 2018) (ordering 500 pages per month and

---

[21] Production may not be linear over the course of months. The agencies may ultimately release more than the anticipated amount in the early months of production and then less as fewer records remain to be processed due to the requirement to provide notice to the private entities.

rejecting plaintiffs' request for 1,000 pages per month, and collecting similar cases); *Republican Nat'l Comm. v. U.S. Dep't of State*, No. 16-486, 2016 WL 9244625, at *1 (D.D.C. Sept. 16, 2016) (ordering 500 pages per month); *see also Clemente*, 71 F. Supp. 3d at 269 ("Clemente's request that the FBI process 5,000 pages a month is higher than the rate would be in an ordinary case . . . .").[22]

Moreover, the factors that justified the extraordinary rate of 5,000 pages per month in the outlier cases are not present here. The requester in *Clemente*, who was independently and uniquely investigating possible FBI corruption regarding mafia informants, was terminally ill and would have been unable to complete her work without the extremely accelerated production schedule. *Clemente*, 71 F. Supp. 3d at 264–65. Her request for 5,000 pages per month came nearly three years after her request was submitted and the FBI had produced very few responsive records in the interim. *Id.* at 269. And the court determined that the requester had "shown considerable capacity to disseminate information to the public," *id.* at 268–69, information that would likely not have been released otherwise because they involved allegations of internal FBI corruption, *see Negley v. U.S. Dep't of Justice*, 305 F. Supp. 36, 46–47 (D.D.C. 2018) (counting, as a factor that favors faster production, the fact that the records involve "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence" (alteration in original)), *aff'd*, No. 18-5133, 2018 WL 4148608 (D.C. Cir. Aug. 14, 2018). Here, Plaintiff does not have a finite amount of time in which to use the information. The catchall requests, pursuant to which the majority of the outstanding records are sought, were submitted only a few months ago, in October 2020. And the agencies have been

---

[22] In the first joint status report, Plaintiff requested that the Army produce 500 pages within the first 30 days. (Dkt. No. 13, at 4–5).

proactively publishing the already-processed records on publicly available websites; there is no allegation that the agencies are attempting to cover up corruption. Furthermore, the cases ordering faster production schedules did not involve the interests of private parties, which, as explained above, slows down the processing significantly.[23]

Defendants oppose Plaintiffs' effort to bifurcate a briefing schedule over redaction-related issues. Defendants do not agree that litigation of the redactions of all contracts in one batch of summary judgment motions will be challenging (Dkt. No. 13, at 5); to the contrary, litigating all redactions at once will be more efficient for the Parties and the Court. *See Republican Nat'l Comm.*, 2016 WL 9244625, at *1 ("[T]he most appropriate time for summary-judgment proceedings [in a FOIA case] would be after the final production is delivered."); *see also Nat. Res. Def. Council v. EPA*, No. 08-01429-PLF, 2009 WL 1767570, at *1 (D.D.C. June 23, 2009) (denying without prejudice a FOIA requester's motion for summary judgment because "an immediate award of judgment typically is considered premature" prior to completion of the agency's production obligations). All of the records sought in this case deal with a similar subject matter—research and development of COVID-19 treatments and vaccines—and, with the

---

[23] As recognized in the answer to the Second Amended Complaint (Dkt. No. 15), HHS granted expedited processing for some of the FOIA requests at issue in this case. Where expedited processing has been granted, the "agency shall process as soon as practicable" any responsive records. 5 U.S.C. § 552(a)(6)(E)(iii). As explained above and in the attached declaration, it is not practicable for HHS to process more than 800 pages every other month, given the amount of records sought in this case and the agency's unusually high volume of other requests. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 302 (D.D.C. 2017) ("The automatic 'penalty' for failing to meet FOIA's twenty-day timeline [for expedited requests] is not the imposition of *another* explicit timeline, but rather 'that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court.'" (emphasis in original) (quoting *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 189 (D.C. Cir. 2013))); *see also id.* ("In cases where expedited processing has been granted, it follows that the district court's supervision will aim to ensure that the agency is processing a request with 'due diligence' *and* as quickly 'as practicable.'" (emphasis in original) (quoting 5 U.S.C. § 552(a)(6)(E)(iii)).

exception of the Phlow communications request, a similar format—contracts between the federal government and private entities. The redactions to each contract raise similar concerns under FOIA Exemption 4. As such, addressing these concerns in a summary judgment motion—as opposed to partial summary judgment motions—will preserve judicial economy and prevent Defendants from needing to produce multiple *Vaughn* indices and from briefing the same or similar issues multiple times. Moreover, were the Court to order bifurcated briefing while production of the outstanding documents was ongoing, the agencies' already-limited resources for addressing FOIA cases would be strained even further.

While courts have on occasion ordered bifurcated briefing in FOIA cases, they have done so where there is good reason for it, such as where the discrete issue of the propriety of one agency's *Glomar* response (neither confirming nor denying the existence of records) can be litigated before another defendant agency finishes its production, *see, e.g.*, Minute Order, *Elec. Frontier Found. v. Dep't of Justice*, No. 1:15-cv-0200-CKK (D.D.C. May 28, 2015) (ordering that "briefing regarding the agencies' Glomar responses should occur while the Criminal Divisions['] rolling productions are occurring"), or where an agency's dispositive assertion of Exemption 7(A) over an entire law enforcement investigation file is litigated before other exemptions that may be applicable to the documents, *see, e.g.*, Minute Order, *James Madison Project v. Dep't of Justice*, Case No. 1:16-cv-2531-TNM (D.D.C. June 18, 2018) (ordering that "[d]efendants' summary judgment briefing may rely solely on Exemption 7(A) with respect to any withholdings or redactions that they believe are subject to that exemption, and any other arguments regarding those withholdings and redactions will be preserved"). Here, to the contrary, Plaintiff does not seek to litigate a discrete issue but rather seeks to litigate the same issue that it expects to arise in the agency's remaining productions, making it inefficient to bifurcate summary judgment briefing.

The Court should follow Judge Boasberg's on-point decision in *Republican National Committee*, rejecting the same kind of attempt by a FOIA plaintiff to file an early summary judgment motion. The records at issue in that case were President Clinton's daily calendars during Hillary Clinton's tenure as Secretary of State, which were emailed to certain State Department officials. The plaintiff sought to move for partial summary judgment while production was ongoing, based on those calendars that had thus far been produced. The plaintiff's goal was to get a judicial ruling on the propriety of the State Department's redaction of nearly all individual calendar entries under FOIA's Exemption 6. Judge Boasberg ruled that it was "too soon to adjudicate State's reliance on Exemption 6" based on the subset of produced documents, reasoning that it would be problematic to apply a decision to the unprocessed documents, and any decision limited to the produced documents "would open the door to burdensome piecemeal litigation." *Republican Nat'l Comm.*, 2016 WL 9244625, at *1; *see also* Order at 2, *Brown v. Dep't of State*, No. 15-cv-1459-CKK (D.D.C. Oct. 31, 2017), ECF No. 36 (denying a plaintiff's attempt to obtain documents more quickly through summary judgment briefing on redactions while productions were ongoing because "Defendant is still in the process of searching for and/or producing documents responsive to Plaintiff's FOIA request. Ruling on the appropriateness of Defendant's withholdings based on a small subset of documents that have been withheld thus far, when additional searches and productions are ongoing, would be extremely inefficient").

The Court has asked Defendants to explain whether they agree with Plaintiff "that information sought will lose informational value over time." Plaintiff's argument appears to be based on the fact that the COVID-19 pandemic, and the federal government's response, are particularly newsworthy events and that the public should have access to any information related to these events while they are still ongoing. The federal response to COVID-19 is newsworthy, but

many other FOIA requests, including requests that result in litigation, deal with newsworthy subjects, including many requests for other COVID-19 related documents. The newsworthiness of a request should not justify an impracticable processing schedule of voluminous records. This is not a case in which some future event will moot the value of the information. *See, e.g.*, Joint Status Report, *Blumenthal v. U.S. Nat'l Archives & Records Admin.*, No. 1:18-cv-02143-RDM (D.D.C.), ECF No. 19 (addressing the urgency for records related to then-Judge Kavanaugh prior to the Senate's confirming him to be an Associate Justice of the U.S. Supreme Court). The contracts sought will still be of interest even after the pandemic is over. Moreover, whatever informational value the records have under FOIA belongs to the public at large, not to any particular requester. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) ("[FOIA] clearly intended to give any member of the public as much right to disclosure as one with a special interest therein.").

Defendants respectfully request that summary judgment briefing begin after the completion of document production. Defendants should have at least 45 days after production of the last responsive document in order to move for summary judgment and *Vaughn* index.[24] Plaintiff should have 30 days thereafter to serve an opposition and cross-motion for summary judgment; Defendants should have 30 days thereafter to serve an opposition and reply; and Plaintiff should have 14 days thereafter to serve its reply. In response to the Court's order that the Parties' propose a schedule for briefing the redactions "on the assumption that the Court will seek to address that dispute concurrently with the proposed schedule for production," Defendants respectfully request that any order to bifurcate briefing of the redactions be accompanied by an order staying the production of additional records during the briefing, given the agencies' limited FOIA resources.

---

[24] A *Vaughn* index may take more time than usual to produce in this case because it is unclear from the Second Amended Complaint which of redacted pages of the already-produced records Plaintiff intends to challenge.

On January 19, 2021, the Court also ordered the Army to provide the following information in this joint status report:

> (a) [T]he number of FOIA requests that the Army is processing (broken down by original requests and consultation requests); (b) the number of pending FOIA requests which the Army has agreed to expedite; (c) the number of pending FOIA requests submitted prior to Plaintiffs request in this case; (d) the number of cases pending in federal court in which a production schedule has been entered that requires the Army to process documents and in which the production is outstanding; (e) the number of the Army's FOIA processing staff, and any efforts the Army is undertaking to hire additional processing staff; and (f) any processing limitations due to the COVID-19 pandemic.

The Army processes thousands of FOIA requests every year. *See* Decl. of Sherrod Davis. Each of the more than 800 Army installations across 70 countries and territories has its own FOIA office and there is no central repository, so it is practically impossible to know how many FOIA requests are being processed or have been expedited at any given time. *Id.* A small number of these cases reach litigation. *Id.* There are currently fewer than twenty cases against the Army pending in federal court in which a production schedule has been entered that requires the Army to process documents and in which production is outstanding. *Id.* The vast majority of cases do not go to court and are resolved at the request level. *Id.*

The records sought in this case are in the custody of one of two installations within ACC: ACC-New Jersey (ACC-NJ) and ACC-Aberdeen Proving Ground, Maryland (ACC-APG). *Id.* Like most Army installations, ACC-APG and ACC-NJ are staffed with a single FOIA processor. *Id.* The contracting officers also provide some assistance in processing FOIA redactions per their responsibility as custodians of the contract file under the Federal Acquisition Regulation. *Id.* Otherwise, there has not been an undertaking to hire additional processing staff in support of the particular FOIA requests at issue in this case. *Id.* Operation Warp Speed is not an enduring mission

set, so the high volume of documents requested as part of that operation is atypical for these contracting centers and the high processing demand is not likely to continue in the long term. *Id.*

There is no reason to believe that the COVID-19 pandemic (*i.e.* telework) itself has diminished ACC-NJ's or ACC-APG's FOIA processing capabilities, as all Army contracts are digitized. *Id.* However, the increased operational demands due to the COVID-19 pandemic has greatly affected the installations' ability to process FOIA requests. *Id.* Under Operation Warp Speed, ACC-APG and ACC-NJ have been central to the contracting effort for all COVID-related vaccine, therapeutic, device, and enabler development and production contracts. *Id.* This enormous undertaking has been layered over these organizations' typical contracting mission sets of equipping and sustaining a military force, without any corresponding increase in organizational manpower. *Id.* ACC has not been provided additional funding for staffing, either with regard to the awarding and managing of COVID-related contracts or with regard to FOIA processing. *Id.* This increased operational strain is likely to continue in the near future as the new administration leverages the federal government's—and ACC's—capabilities to assist in the distribution of COVID-19 vaccines. *Id.* And because the contracting officers are required to assist with FOIA processing, any additional requirement that more time be devoted to the processing of a broad FOIA request may take away from ACC's ability to focus on the mission of awarding and managing contracts in support of the federal COVID-19 response. *Id.*

## DEFENDANTS' PROPOSALS

## I.    Schedule for Production of Outstanding Records

Defendants propose that HHS release the outstanding responsive records at a rate of 800 pages every other month and that the Army release the outstanding responsive records at a rate of eight actions per month, until all responsive records have been released.

42

**II.      Bifurcation of Briefing Redaction-Related Issues**

Defendants oppose bifurcation of briefing on redactions for the reasons stated above. Defendants propose that briefing on redaction-related issues begin after production of the last responsive record, with 45 days for Defendants to move for summary judgment, 30 days for Plaintiff's opposition and cross-motion for summary judgment, 30 days for Defendants' opposition and reply, and 14 days for Plaintiff's reply.

**III.      Proposed Schedule for Bifurcated Briefing**

If, over Defendants' objection, the Court orders bifurcated briefing, Defendants propose that production of outstanding records be stayed pending the first round of summary-judgment briefing. Thereafter Defendants would have 45 days to produce its summary judgment motion with *Vaughn* index; Plaintiff would have 30 days to serve an opposition and cross-motion for summary judgment; Defendants would have 30 days to serve an opposition and reply; and Plaintiff would have 14 days to serve a reply.

Dated: February 5, 2021                                    Respectfully submitted,

                                                                              */s/ Kathryn Ardizzone*
                                                                              Kathryn Ardizzone (D.C. Bar No. 1631208)
                                                                              Knowledge Ecology International
                                                                              1621 Connecticut Ave NW, Suite 500
                                                                              Washington, DC 20009
                                                                              (202) 332-2670
                                                                              kathryn.ardizzone@keionline.org

                                                                              *Counsel for Plaintiff*

                                                                              BRIAN M. BOYNTON
                                                                              Acting Assistant Attorney General

                                                                              ELIZABETH J. SHAPIRO
                                                                              Deputy Branch Director

                                                                              */s/ Michael P. Clendenen*
                                                                              MICHAEL P. CLENDENEN

43

(D.C. Bar # 1660091)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 353-0693
Fax: (202) 616-8460
Email: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*